**Albert CHINCHILLO, Plaintiff,**

**v.**

**Donald E. POWELL, Chairman, Federal Deposit Insurance Corporation,[1] Defendant.**

**No. CIV.A.98–1128 PLF.**

United States District Court, District of Columbia.

Jan. 7, 2003.

---

**1.** Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Donald E. Powell, the current Chairman of the Federal Deposit Insurance Corporation, is substituted for Donna A. Tanoue, the former Chairman, who was substituted for Andrew C. Hove, who was sued in his official capacity and was Acting Chairman of the Federal Deposit Insurance Corporation at the time the case was filed. *See* FED. R. CIV. P. 25(d)(1).

Stephen Domenic Scavuzzo, Vienna, VA, for Plaintiff.

Ingeborg G. Chaly, Legal Division, FDIC, Washington, DC, for Defendant.

*OPINION*

PAUL L. FRIEDMAN, District Judge.

Plaintiff Albert Chinchillo brings this action under the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.* He alleges that the Federal Deposit Insurance Corporation discriminated against him when it terminated him for poor performance caused by his disability—severe depression. Defendant has moved for summary judgment on the ground that plaintiff has failed to make out a *prima facie* case under the Rehabilitation Act. Based on the arguments and authorities presented in the parties' briefs and the entire record herein, the Court grants defendant's motion for summary judgment.

## I. BACKGROUND

Plaintiff worked in the FDIC's Office of Training and Educational Services ("OTES") as an Employee Development Specialist from June 29, 1992, until June 18, 1993. *See* Defendant's Statement of Material Facts as to Which There is No Genuine Issue ¶¶ 1, 8 ("Def.'s Statement of Facts"). Plaintiff was hired for a term appointment not to exceed four years and was required to serve a one year trial period. *See* Defendant's Memorandum of Points and Authorities in Support of Defendant's Motion for Summary Judgment at 1 ("Def.'s Motion"), Exhibit A, *Chinchillo v. FDIC,* Equal Employment Opportunity Commission, August 14, 1995 at 2 ("EEOC Opinion"). Shortly after he began his service with the FDIC, plaintiff began to experience performance difficulties, which continued throughout his time of employment. *See* Def.'s Motion, Exhibit D, Transcript of July 15, 1994 Merit Systems Protection Board ("MSPB")

Hearing ("MSPB Hearing Tr.") at 34, 52–60 (Testimony of·Albert Chinchillo).

In January 1993, Mary Killeen became plaintiff's immediate supervisor and soon began to observe problems with his performance. *See* MSPB Hearing Tr. at 68–69 (Testimony of Mary Killeen). Ms. Killeen met with Mr. Chinchillo on March 17, 1993, to discuss his poor performance and to warn him that he would not be retained beyond his trial period unless his performance improved. *See* Def.'s Statement of Facts ¶ 3; Def.'s Motion, Exhibit N, Plaintiff's Response to Requests for Admission ¶¶ 5, 6 ("Plaintiff Admissions"). On May 14, 1993, Ms. Killeen officially recommended plaintiff's termination within his trial period. *See* Def.'s Motion, Exhibit K, Memorandum from Mary Killeen to Peggy Stokes, May 14, 1993 (recommending termination of plaintiff based on poor performance). Plaintiff's employment was terminated effective June 18, 1993. *See* Plaintiff Admissions ¶ 12.

On May 20, 1993, prior to his removal, plaintiff contacted an FDIC Equal Employment Opportunity counselor and alleged that he had been discriminated against based on his mental. disability—severe depression—at the time his supervisor recommended termination. *See* Plaintiff Admissions ¶ 13. In addition, concurrent with making these allegations of discrimination, plaintiff applied to the United States Office of Personnel Management ("OPM") to receive disability retirement benefits under the Federal Employees' Retirement System ("FERS"). *See id.* ¶ 19. His application for disability retirement benefits was refused upon initial submission and again upon reconsideration. Plaintiff then appealed to the United States Merit Systems Protection Board. *Id.* ¶¶ 20–21.

At the hearing before the MSPB, plaintiff's supervisor, Mary Killeen, recounted in detail plaintiff's poor work performance. *See* Plaintiff Admissions ¶ 22; MSPB Hearing Tr. at 71–73. As restated by the MSPB in its opinion following the hearing, Ms. Killeen testified that

> [plaintiff] seemed to lose track of details . . . . He was unable to remember things that were agreed to at meetings or get them confused and change them. . . . There was a lot of confusion, and that confusion was consistently having to be handled or fixed up by somebody else, either by [Ms. Killeen], or [plaintiff's] team members. . . . It took him four to five weeks to prepare a simple, straight-forward memorandum. . . .

Def.'s Motion, Exhibit E, *Chinchillo v. Office of Personnel Management*, MSPB, September 8, 1994, at 9 ("MSPB Opinion").

Ms. Killeen also recorded plaintiff's deficiencies in notes taken after a meeting with Mr. Chinchillo on March 17, 1993, describing plaintiff's "inability to efficiently generate routine memoranda; inadequate support for 'clients' within the agency; failure to pull weight *vis a vis* teammates; inability to understand agreements reached after long meetings held to acquire consensus on plans of action; inability to grasp the content of work; failure to properly carry out functions as a contract manager; and frustration with simple tasks." EEOC Opinion at 2, n. 2 (summarizing content of Mary Killeen's March 18, 1993 notes). Ms. Killeen memorialized her negative assessment of plaintiff's performance in a March 26, 1993 letter to plaintiff. *See* Plaintiff Admissions ¶ 7.

Plaintiff's clinical psychologist, Dr. W. Mark Lassleben, submitted two reports to the MSPB and testified at the MSPB hearing that Mr. Chinchillo suffered from major clinical depression. *See* MSPB Opinion at 4. Dr. Lassleben reported that plaintiff "is sufficiently depressed as to be disabling, to keep him from functioning in his

former position" and "is not capable of performing useful and efficient service in the former Employee Development Specialist position at this time, because of the number of tasks which require initiative and implementation." MSPB Opinion at 6–7 (summarizing testimony of Dr. Lassleben). Dr. Lassleben explained that when a person is diagnosed with this mental disease, "these skills are the first things that they are unable to perform." *Id.* at 7. A task that requires "creativity, innovation, or just 'getting the ball rolling, so to speak,' is very difficult for someone who is even mildly depressed, and Mr. Chinchillo is more than mildly depressed." *Id.* Dr. Lassleben further testified that there was no guarantee that plaintiff would ever again be able to do the work he had been doing. *Id.*

Confirming this assessment, plaintiff himself testified at the MSPB hearing that he had been unable to perform the essential functions of his job at the FDIC. MSPB Hearing Tr. at 52. Plaintiff stated that

> ... [starting around November of 1992] I found—when I was participating in meetings with [co-workers] or when we were trying to carry out tasks that had to do with interviewing people, making associations between some of the things that had been said in the interviews and maybe what it meant as far as training needs were concerned—I couldn't do it. ... [I had never had a problem with this before that.] ... I was having trouble communicating with my co-workers ... because I was withdrawing myself from participating with them, because I felt guilty, because I felt that I was letting down my end of the bargain. ... I made bad proposals. ... I was ineffective in making decisions concerning the delivery of the contractor. I was unable to sequence the events that were going to have to occur and develop

memorandums [sic] and letters of understanding. ... I just couldn't do it.

MSPB Hearing Tr. at 52–59. When asked if he thought he could return and perform the duties of his prior position, given the therapy and medication that he had received, plaintiff stated clearly that he could not do so. He testified that "the therapy and medication have not improved the functions of my brain sufficiently ... to allow me to go back to doing the things that I couldn't do before in the FDIC." *Id.* at 60. While stating that he probably could find some employment, plaintiff testified that he could not see himself being able to do "the kinds of very involved work that I was doing with the FDIC ... any better than I did when I left." *Id.*

Based upon the testimony of Dr. Lassleben, plaintiff's supervisor Mary Killeen, and plaintiff himself, the MSPB reversed the OPM's previous denial of plaintiff's application for disability retirement benefits and ordered that the application be granted. The Board concluded that plaintiff's depression was severe enough to be disabling and to prevent him from functioning in his position as an Employment Development Specialist with the FDIC. MSPB Opinion at 11.

Meanwhile, plaintiff was pursuing administrative claims of discrimination within the FDIC. This EEO process included: a formal hearing on the merits of plaintiff's claim on May 10, 1995; a Recommended Decision by an Administrative Law Judge on August 14, 1995, finding no discrimination; a Final Agency Decision on September 25, 1995, adopting the Recommended Decision; and an appeal resulting in summary affirmance of the Recommended Decision by the Office of Federal Operations on February 3, 1998. *See* EEOC Opinion at 1; Def.'s Motion, Exhibit B, *Chinchillo v. FDIC,* FDIC, September 25, 1995;

Def.'s Motion, Exhibit C, EEOC Affirmance of FDIC Final Decision, February 3, 1998.

On May 6, 1998, three months after the agency issued its final decision that plaintiff had not suffered discrimination based on his depression, plaintiff filed this action under Section 501 of the Rehabilitation Act of 1974, 29 U.S.C. § 791. Defendant immediately moved to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, arguing that plaintiff had failed to state a claim under the Rehabilitation Act because the evidence presented during the MSPB appeal process precluded plaintiff from making out a *prima facie* case of discrimination. *See* Defendant's Motion to Dismiss Complaint, July 10, 1998. Defendant also argued for dismissal based on the Supreme Court's decision in *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999), asserting that plaintiff's testimony before the MSPB was incompatible with his claim that he is a "qualified individual" for employment. *Id.* The Court denied defendant's motion to dismiss on the ground that it asked the Court to rule on issues of fact properly raised only in a motion for summary judgment or at trial. *See* Order, July 14, 2000 at 2; FED. R. CIV. P. 56. Defendant subsequently moved for summary judgment on the ground that plaintiff is not a "qualified individual" protected from discrimination under the Rehabilitation Act.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment shall be granted if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits or declarations, if any, demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). Material facts are those that "might affect the outcome of the suit under the governing law...." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When considering a summary judgment motion, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. 2505; *see also Washington Post Co. v. United States Dep't of Health and Human Services*, 865 F.2d 320, 325 (D.C.Cir.1989).

Even in employment discrimination cases, however, the non-moving party's opposition must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. FED. R. CIV. P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-moving party is "required to provide evidence that would permit a reasonable jury to find" in its favor. *Laningham v. United States Navy*, 813 F.2d 1236, 1242 (D.C.Cir.1987). If the non-movant's evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249–50, 106 S.Ct. 2505. To defeat summary judgment, a plaintiff must have more than "a scintilla of evidence to support his claims." *Freedman v. MCI Telecommunications Corp.*, 255 F.3d 840, 845 (D.C.Cir.2001).

## III. THE REHABILITATION ACT

■ Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity re-

ceiving Federal financial assistance or ... conducted by any Executive agency ...." 29 U.S.C. § 794(a). Section 501(b) of the Act, 29 U.S.C. § 791(b), applies uniquely to federal employers; it requires them to take affirmative action on behalf of individuals with disabilities, an obligation beyond the general non-discrimination requirement in Section 504. *See Southeastern Community College v. Davis,* 442 U.S. 397, 410–11, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979). Under Section 501(b) and the applicable EEOC regulations, a federal agency must make "reasonable accommodation to the known physical or mental limitations of an applicant or employee who is a qualified individual with handicaps, unless the agency can demonstrate that the accommodation would impose an undue hardship on the operations of its program." *Carr v. Reno,* 23 F.3d 525, 528–29 (D.C.Cir.1994), *quoting* 29 C.F.R. § 1614.203(c)(1); *see also Scarborough v. Natsios,* 190 F.Supp.2d 5, 19 (D.D.C.2002); *Johnson v. Brown,* 26 F.Supp.2d 147, 149 (D.D.C. 1998).[2]

In order to establish a *prima facie* case of discrimination under the Act, a plaintiff must show that: (1) the plaintiff is an individual with a disability within the meaning of the Act, (2) the plaintiff can otherwise perform the essential functions of his job with reasonable accommodation, and (3) the employer refused to make such an accommodation or discharged the plaintiff because of his handicap. *Barth v. Gelb,* 2 F.3d 1180, 1186 (D.C.Cir.1993), *cert. denied,* 511 U.S. 1030, 114 S.Ct. 1538, 128 L.Ed.2d 190 (1994); *see also Scarborough v. Natsios,* 190 F.Supp.2d at 19; *LaCorte v. O'Neill,* 139 F.Supp.2d 45, 47–48 (D.D.C.2001); *Gaskins v. Runyon,* 921 F.Supp. 779, 781 (D.D.C.), *affirmed,* 1994

WL 704080 (D.C.Cir.1994), *cert. denied,* 516 U.S. 832, 116 S.Ct. 106, 133 L.Ed.2d 60 (1995).

Because the parties in this case agree that plaintiff is an individual with a disability, *see* Def.'s Motion at 7, this case centers on the second element of the *prima facie* case of discrimination under the Rehabilitation Act: whether plaintiff is "otherwise qualified" for employment by the FDIC and, with a reasonable accommodation, can perform the essential functions of his job.

### A. "Qualified Individual with a Disability"

A "qualified individual with handicaps" is one "who, *with or without reasonable accommodation,* can perform the essential functions of the position in question without endangering the health and safety of the individual or others ...." 29 C.F.R. § 1614.203(a)(6) (emphasis added). An individual with a disability is "qualified" if he or she can perform the essential functions of the position with reasonable accommodation; an accommodation is considered "reasonable" if it allows the employee to fulfill all essential functions of his or her job without imposing an undue hardship on the employer. *See* 29 C.F.R. § 1614.203(c)(1); *Carr v. Reno,* 23 F.3d at 529; *Barth v. Gelb,* 2 F.3d at 1186–87. Because plaintiff has admitted that he was (and continues to be) unable to perform the essential functions of his job without some form of accommodation, *see* MSPB Hearing Tr. at 59–60, the Court must determine whether some reasonable accommodation to enable him to perform those functions could have been provided. *See Carr v. Reno,* 23 F.3d at 529. Plaintiff has the burden of identifying what reasonable accommodation would have enabled him to perform the essential functions of his em-

---

**2.** References to the Code of Federal Regulations throughout this Opinion are to the 2001 edition. For the current iteration of the regu- lations cited herein, *see* 29 C.F.R. Part 1630 (2002), particularly 29 C.F.R. §§ 1630.2, 1630.9, 1630.15.

ployment, but the agency has the burden of proving undue hardship. *See Barth v. Gelb,* 2 F.3d at 1186.

### B. Reasonable Accommodation

■ Section 501 of the Rehabilitation Act requires a high level of accommodation by federal employers and provides that "[r]easonable accommodations may include, but shall not be limited to: (i) Making facilities readily accessible to and usable by individuals with handicaps; and (ii) Job restructuring, part-time or modified work schedules, acquisition or modification of equipment or devices, appropriate adjustment or modification of examinations, the provision of readers and interpreters, and other similar actions." 29 C.F.R. § 1614.203(c)(2); *see Carr v. Reno,* 23 F.3d at 528. Despite this high expectation of federal employers, the Court finds that the FDIC properly rejected each of these options with respect to plaintiff.

The testimony at the MSPB hearing of plaintiff's clinical psychologist and former supervisor, as well as plaintiff's own testimony, reveals that the very manner in which plaintiff's disability affects his work—causing an inability to make judgments and logistical arrangements, complete assignments within a reasonable time and communicate with others—precludes him from performing essential functions of his job. *See, e.g.,* MSPB Hearing Tr. at 71–73, 75–78; EEOC Opinion at 2–20; *see also Carr v. Reno,* 23 F.3d at 530 (plaintiff with disease causing periodic dizziness, vomiting and nausea not a "qualified individual" because even with reasonable accommodation, she could not work regular hours and therefore could not perform essential functions of job; "an essential function of any government job is an ability to appear for work . . . and to complete assigned tasks within a reasonable period of time."); *Bolstein v. Reich,* No. 93–1092, 1995 WL 46387 (D.D.C. Jan. 19, 1995),1995

U.S. Dist. LEXIS 731, at *11, *aff'd,* 1995 WL 686236, (D.C.Cir. Oct. 4, 1995), 1995 U.S.App. LEXIS 32536 (plaintiff not a "qualified" disabled individual who could be reasonably accommodated because "the very manner in which plaintiff's [depression] impacts his ability to work" was an "essential" characteristic of the position); *Matzo v. Postmaster General,* 685 F.Supp. 260, 263 (D.D.C.1987) (legal secretary with manic-depressive disorder was not "qualified" individual because "a handicap which deprives a worker of an ability to fulfill an essential requirement of his craft can never be 'otherwise qualified.' ").

In his effort to demonstrate that he was qualified, plaintiff suggests two accommodations that might have enabled him to recover from his mental condition and perform the duties required for his job: (1) Indefinite Leave–Without–Pay ("LWOP"), and (2) extension of plaintiff's trial employment period for several months to allow him to seek medical treatment and to permit the treatment to take effect. *See* Plaintiff's Brief in Support of His Opposition to Defendant's Motion for Summary Judgment at 2; EEOC Opinion at 5. The Court finds, however, that neither of these accommodations was "reasonable" and thus neither was required.

While adopting either of plaintiff's suggestions would have allowed him to receive treatment that might have had the potential to enable him to perform his duties, both would have imposed undue hardships on the defendant. Prospects for the plaintiff's improvement were uncertain and speculative. Plaintiff's medical expert, Dr. Lassleben, initially estimated six months for treatment and recovery, but later described that prognosis as "overly optimistic" and predicted that recovery would take almost a year. At the MSPB hearing, Dr. Lassleben could not provide any firm estimate of time required for plain-

tiff's recuperation or even an assurance that plaintiff would ever recover the ability to perform his essential job functions: "[I]t is so speculative, and depends on so many things." MSPB Opinion at 7 (restating Dr. Lassleben's testimony).[3] Indeed, plaintiff's mental capacity remained diminished in July of 1994, a full year after his termination. *Id.* Even two years after plaintiff's termination, in August of 1995, the EEOC noted that plaintiff had been unable to hold a job since June 1993 and concluded that defendant was not legally obligated to await an indefinite and uncertain recovery period. *See* EEOC Opinion at 19.

This Court agrees with the Commission's determination. There is no evidence in the record that extending plaintiff's probationary period or granting him LWOP would have allowed him to make decisions more effectively, to gain initiative or to complete simple tasks such as producing · memoranda within a reasonable time. *See, e.g.,* MSPB Hearing Tr. at 59–60; MSPB Opinion at 7; EEOC Opinion at 19. Because there was no reasonable assurance

that plaintiff's performance was likely to improve—immediately or even in the distant future—even with the accommodation of time off for treatment and recovery, defendant was not required to provide such an accommodation. *See Sampson v. Citibank,* 53 F.Supp.2d. 13, 18 (D.D.C. 1999) ("[defendant] cannot be held liable under the ADA for terminating plaintiff when her own physician gives no estimate as to the expected duration of her ' "total disability." ' ").[4]

It is also possible in some cases to reassign a disabled employee to a different position as an accommodation, but it would not have been reasonable here because the same skills and functions impeded by plaintiff's depression also were required for other positions at the FDIC.[5] Plaintiff's supervisor, Mary Killeen, testified that lower-level jobs in plaintiff's branch would have required many of the same skills and tasks that were frustrating plaintiff in his current position. MSPB Hearing Tr. at 84–86 (Testimony of Mary Killeen); *see also* Def.'s Motion, Exhibit F, Transcript of May 10, 1995 EEOC Hearing at 106–07

3. As noted in the MSPB Opinion, Dr. Lassleben "has an optimistic prognosis for the [plaintiff], but he is much more skeptical about making time estimates about when the [plaintiff] will recover. The [plaintiff] is a 'problematic treatment responder (a person who, even with good treatment, does not get better quickly, or to the same degree that most people in the population do).' " MSPB Opinion at 6.

4. While the Court finds the proposed accommodation of granting indefinite LWOP or extending plaintiff's probationary period to be unreasonable in this case, the Court rejects defendant's argument that federal regulations prohibited such accommodations. Defendant is correct that under 5 C.F.R. § 315.802(a) and (c), "the probationary period [applicable to plaintiff] is 1 year and may not be extended," and "[n]onpay time in excess of 22 workdays extends the probationary period by an

equal amount ...." The Court is unconvinced, however, that defendant could not have found a way to suspend or extend plaintiff's trial period. Indeed, an employee relations specialist at the FDIC, Peggy L. Stokes, conceded that it had been done before. *See* EEOC Opinion at 18. The Court also rejects the contention that defendant's personnel regulations preempt its obligations to provide reasonable accommodations under the Rehabilitation Act.

5. Defendant claims that although it attempted to reassign plaintiff, it was under no legal obligation to do so because he was a probationary employee. *See* Def.'s Motion at 15; 29 C.F.R. § 1614.203(g) (stating the procedure for reassignment only as applied to "nonprobationary employee[s]".). In view of its decision that defendant is entitled to summary judgment on other grounds, the Court need not address this issue.

("EEOC Hearing Tr.") (Testimony of Peggy L. Stokes). Specifically, Ms. Killeen testified that other positions required analyzing data, scheduling, managing logistics, making needs assessments, planning courses and delivering training, and that these were the very tasks with which plaintiff had the most difficulty. EEOC Opinion at 43–45, 84. Peggy Stokes testified that she and Mary Killeen explored other reasonable accommodations for Mr. Chinchillo including reassignment, job restructuring and the feasibility of a part-time work schedule. *See* EEOC Hearing Tr. at 107 (Testimony of Peggy Stokes). Ms. Stokes and Ms. Killeen found, however, that none of theses scenarios would solve performance deficiencies related to the plaintiff's problems with memory, organization and judgment. *See* EEOC Opinion at 18.

In the circumstances presented, the Court concludes that the FDIC has shown that reassignment was not a reasonable accommodation that it could have provided without "impos[ing] an undue hardship on the operations of its program." *Carr v. Reno*, 23 F.3d at 528. "The Rehabilitation Act mandates nondiscrimination against disabled individuals; it does not waive basic prerequisites to service." *Wilber v. Brady*, 780 F.Supp. 837, 840 (D.D.C.1992); *see Bolstein v. Reich*, 1995 WL 46387, 1995 U.S. Dist. LEXIS 731, at *12 (same). *See also Carr v. Reno*, 23 F.3d at 530 ("If it is unreasonable to ask the Office to continue to put up with [the employee's] poor attendance, it is equally unreasonable .to require the Office to refer an unqualified employee to another government agency for employment."). Here, it would be unreasonable to require the FDIC to reassign Mr. Chinchillo to another position for which he was equally unqualified to carry out the essential functions.

### C. Plaintiff's Application for Retirement Benefits Based on Total Disability

The conclusion that there are no genuine issues of material fact and that defendant is entitled to judgment as a matter of law is further supported by plaintiff's application for disability retirement benefits under the Federal Employee's Retirement System. In that application, plaintiff himself described how the effects of his depression had rendered him unable to perform the essential functions of his job. *See* Def.'s Motion, Exhibit G, Application of Albert Chinchillo for FERS disability retirement, June 15, 1993 at 1 ("FERS Application"). As discussed below, the fact that plaintiff applied for and received retirement benefits on grounds of disability at the same time that he alleged illegal discrimination based on the failure to provide a reasonable accommodation for his disability further demonstrates that plaintiff was unqualified to perform the essential functions of his job and that no reasonable accommodation was possible.

In order to receive FERS benefits on the basis of a disability, an employee must represent, among other things, that his "disabling medical condition... [is] incompatible, with either useful and efficient service or retention in the position...." 5 C.F.R. § 844.103(a)(2). To be eligible for such benefits, it also must be established that "[a]ccommodation of the disabling medical condition in the position held must be unreasonable." 5 C.F.R. § 844.103(a)(4). These representations and requirements appear to be in direct conflict with the essential element of plaintiff's discrimination claim under the Rehabilitation Act that he is a " 'qualified individual with a disability'—that is, a person 'who, with or without reasonable accommodation, can perform the essential functions' of her job." *Cleveland v. Policy Management Systems Corp.* 526 U.S. at 806, 119

S.Ct. 1597 (*citing* 42 U.S.C. § 12111(8)).[6]

In *Cleveland,* the plaintiff had pursued an Americans with Disabilities Act ("ADA") claim of discrimination while at the same time applying for Social Security Disability Insurance ("SSDI") benefits. In order to receive SSDI benefits she had to represent, among other things, that she was "unable to work." 42 U.S.C. § 423(d)(2)(A). The Supreme Court determined that claims for SSDI are not inherently in conflict with discrimination claims under the ADA because SSDI claims are made without consideration of "reasonable accommodations," while ADA claims depend upon a showing that the claimant's disability could be reasonably accommodated. *See Cleveland v. Policy Management Systems Corp.,* 526 U.S. at 802–03, 119 S.Ct. 1597. The Court held that while a claimant cannot ignore the apparent contradiction arising out of a concurrent SSDI claim for disability benefits and a charge of discrimination, it is possible in some cases for a claimant to explain the inconsistency and the burden is on the claimant to do so. *See Cleveland v. Policy Management Systems Corp.,* 526 U.S. at 806, 119 S.Ct. 1597.

By contrast, this case involves plaintiff's application for FERS benefits, rather than SSDI benefits. While claims for SSDI benefits are made without consideration of "reasonable accommodation," FERS determinations, like those under the Rehabilitation Act, expressly turn on the availability of reasonable accommodation. *See* 5 C.F.R. § 844.103. In order to be eligible for FERS benefits, an employee must show that his disabling medical condition is not compatible with "either useful and efficient service or retention in the position," and that "[a]ccommodation of the disabling medical condition in the position held [is] unreasonable." 5 C.F.R. § 844.103(a)(2), (a)(4). An employee cannot plausibly claim that he is unable to work at all to obtain FERS benefits but able to work with an accommodation in connection with a Rehabilitation Act claim. A plaintiff filing both a FERS claim for benefits and a Rehabilitation Act claim of discrimination cannot reconcile the inherent conflict, as might a plaintiff who sought SSDI benefits along with relief based on a claim of discrimination.

Plaintiff in this case sought and received FERS benefits on the ground that he was unable to work, with or without reasonable accommodation. Plaintiff therefore was not "otherwise qualified" for employment under the Rehabilitation Act when he was terminated by the FDIC..[7] Based on plaintiff's application for FERS benefits and his representation in that context that no reasonable accommodation of his disability was possible, the relevant case law, and the entire record in this case, the Court finds that there is no genuine issue of fact as to whether plaintiff was a "qualified individual with handicaps" under the Rehabilitation Act. With or without reasonable accommodation, plaintiff could not perform the essential functions of his job or other jobs within the FDIC. For these reasons, the defendant's motion for summary judgment is granted.

An Order consistent with this Opinion will issue this same day.

SO ORDERED.

---

6. This statutory language found in the Americans with Disabilities Act is mirrored in the Rehabilitation Act and regulations. *See* 29 U.S.C. § 791(b); 29 C.F.R. § 1614.203(a)(6) and (c)(1). *See supra* at 22–24.

7. Based on the above findings, the Court need not reach the third element of a *prima facie* case under the Rehabilitation Act, the question of whether plaintiff was adversely treated or denied the benefits of his position—in this case, by being discharged—because of his disability.

**28**

## ORDER AND JUDGMENT

For the reasons stated in the Opinion issued in this case this same day, it is hereby

ORDERED that defendant's motion for summary judgment [17] is GRANTED; and it is

FURTHER ORDERED that JUDGMENT is entered for the defendant and the case is DISMISSED with prejudice. The Clerk of the Court shall remove this case from the docket of the Court. This is a final appealable order. *See* Rule 4(a), FED. R. CIV. P.

SO ORDERED.